UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| KENNETH LEE ZAMARRON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:21-cv-00098-JMS-MKK |
| ) | |
| WEXFORD HEALTH SOURCES, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANT BROWN'S FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kenneth Zamarron, who is incarcerated at Wabash Valley Correctional Facility ("WVCF"), alleges in this civil rights lawsuit that he suffers from dissecting cellulitis of the scalp, a condition that results in inflammation and bacterial infections. He has sued Dr. Samuel Byrd, Nurses Kim Hobson and Amy Wright, Wexford Health Sources, Inc., and Wexford of Indiana, LLC (the "Medical Defendants"), and Warden Richard Brown alleging that they were deliberately indifferent to this condition. The defendants have filed motion for summary judgments on Mr. Zamarron's claims. For the reasons below, defendant Brown's motion for summary judgment is **GRANTED** and the Medical Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021).

A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because the defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. The Parties

Mr. Zamarron is an inmate of the Indiana Department of Correction ("IDOC"), housed at WVCF. Dkt. 1.

During the relevant time, Dr. Byrd worked for Wexford of Indiana, LLC as a doctor at WVCF. Dkt. 153-1 ¶ 2 (Byrd Aff.).

Kim Hobson worked as the health services administrator ("HSA") at WVCF. Dkt. 153-2 ¶ 2 (Hobson Aff.). Her job duties were primarily administrative in nature, including oversight of medical services at the facility, ensuring compliance with IDOC Health Services Directives, and serving as a liaison between IDOC and medical staff. *Id.* ¶ 3. She also responded to requests for information and grievances on behalf of the medical department. *Id.* She was rarely involved in direct patient care or contact. *Id.*

Amy Wright worked at WVCF as the Director of Nursing. Dkt. 153-3 ¶ 2 (Wright Aff.).

As nurses, Ms. Hobson and Ms. Wright did not have the legal authority to diagnose patients or order specific medical treatment. Dkt. 153-2 ¶ 6; dkt. 153-3 ¶ 5.

Wexford of Indiana, LLC's Technical Proposal to the IDOC discussed several costs savings methods. *See generally* dkt. 199-50. For example, that Proposal states in several paragraphs that Wexford will provide cost savings. *See, e.g., id.* at 2, 5, 8, 11. Wexford explains that it will save money is through its telehealth program, *see id.* at 4, 13, and through pharmacy cost management strategies including pill splitting and "the use of cost-effective medications." *Id.* at 21, 183. Wexford Health Sources, Inc. is not the parent corporation of Wexford of Indiana, LLC, and did not provide medical services in Indiana, and was not involved in Mr. Zamarron's care and treatment. Dkt. 153-5 (Wexford's Interrogatory Responses).

Richard Brown was the Warden at WVCF until April 1, 2020. Dkt. 155-2 ¶ 4 (Brown Aff.). Mr. Brown now serves as an Executive Director for the IDOC. *Id.* As Warden, he appointed a designee to respond to inmate grievance appeals in accordance with the Offender Grievance Process. *Id.* ¶ 8. Warden Brown is not a trained medical professional and does not have the authority to prescribe medical treatment. Dkt. 155-2 ¶ 12-13.

### B. Mr. Zamarron's Medical Care

#### 1. Dr. Byrd

Mr. Zamarron has suffered from painful lesions on his scalp for several years. *See* dkt. 1 (verified complaint describing skin issues dating back to 2014). He saw Dr. Byrd for this condition for the first time in 2016. Dkt. 1 at 8.[1] On March 17, 2017, Dr. Byrd performed a steroid injection into four cysts in Mr. Zamarron's scalp. Dkt. 199-9. Dr. Byrd noted his "hopes that this would decrease size and pain associated with lesions." *Id.*

About two weeks later, Mr. Zamarron was prescribed Cleocin T solution, which is a topical solution used to treat acne. Dkt. 153-4 at 74; dkt. 153-1 ¶ 6. Mr. Zamarron told Dr. Byrd that he had previously been prescribed Cleocin T solution in October of 2016, and that it was not effective. Dkt. 199-3 ¶ 16 (Zamarron Aff.).

Dr. Byrd administered intralesional injections into the cysts on Mr. Zamarron's scalp again on June 16, 2017. *See* dkt. 153-4 at 73. Mr. Zamarron told Dr. Byrd that he had previously had intralesional injections that were not effective and requested to see a dermatologist. Dkt. 199-3 ¶ 17.

Two months later, another order for Cleocin T solution was entered. Dkt. 153-4 at 72.

---

[1] The Medical Defendants point out that Mr. Zamarron's claims based on care he received before April 1, 2017, have been dismissed. *See* dkt. 138. Nonetheless, Dr. Byrd's treatment of Mr. Zamarron before April 1, 2017, is relevant his knowledge of Mr. Zamarron's condition and to the consideration of the treatment he provided during the relevant timeframe.

4

Dr. Byrd saw Mr. Zamarron for a follow-up on November 16, 2017. Dkt. 153-4 at 69-71. Mr. Zamarron had three cysts on his scalp and indicated that he would either like them removed or treated with something different. *Id.* Mr. Zamarron also had a pilonidal cyst near his tailbone that he requested to be removed surgically. *Id.* Dr. Byrd advised him this would be a major surgery that he could not perform at the facility. *Id.*

On December 13, an order for the antibiotic Bactrim was entered for the cyst. Dkt. 153-4 at 68. Again, Mr. Zamarron explained that he had previously taken Bactrim and it was not effective. Dkt. 199-3 ¶ 18.

On February 22, 2018, Dr. Byrd saw Mr. Zamarron. Dkt. 153-4 at 64-66. Dr. Byrd noted that the steroid injections had been the most beneficial, but that the lesions persisted. *Id.* Mr. Zamarron still had the same three cysts as before, and two more had developed. *Id.* He also still had the cyst on his tailbone, which had not responded to Bactrim. *Id.* Mr. Zamarron agreed to try a three-week trial of Cipro to treat the tailbone cyst. Dr. Byrd also planned to biopsy the scalp cysts. *Id.*

Mr. Zamarron was seen in a nurse visit on March 7, 2018, for complaints that he had not received a biopsy and that he had draining cysts. Dkt. 153-4 at 62-63. The nurse did not observe drainage on Mr. Zamarron's head. *Id.* Mr. Zamarron did undergo a scalp biopsy on March 16, 2018. Dkt. 153-4 at 61.

Dr. Byrd saw Mr. Zamarron for a follow-up on a few days later and told Mr. Zamarron that the biopsy showed scarring consistent with pilar cysts and no malignancy. *Id.* at 58-60. Dr. Byrd believed that Mr. Zamarron appeared to have a genetic predisposition to pilar cysts, given his age and the multiple cysts on his scalp. *Id.* Dr. Byrd advised Mr. Zamarron that he had experienced

limited success using doxycycline for prevention of acute infection, and Mr. Zamarron indicated he would try it. *Id.*

Mr. Zamarron saw Dr. Byrd again a few months later. Dkt. 153-4 at 55-57. Mr. Zamarron stated he did not want to continue antibiotics but wanted some type of procedure to treat his cysts. *Id.* Dr. Byrd scheduled a procedure to remove the cysts on Mr. Zamarron's scalp and ordered a trial of the topical antibiotic Silvadene for 90 days. *Id.*; dkt. 153-1 ¶ 16.

On September 14, 2018, Dr. Byrd saw Mr. Zamarron for follow-up. Dkt. 153-4 at 48-52. Dr. Byrd attempted to excise the cysts on Mr. Zamarron's scalp but ran into scar tissue and therefore abandoned the procedure. *Id.* He believed removing the scar tissue would cause more scar tissue to develop, rather than resolve Mr. Zamarron's condition. Dkt. 153-1 ¶ 18. He advised Mr. Zamarron that a more radical approach would be necessary to remove the lesions on his scalp, which he did not have the training for. Dkt. 153-4 at 48-52. Dr. Byrd also advised Mr. Zamarron that excision of the cyst on his tailbone was beyond his scope of training, and he would request an evaluation by an offsite specialist. *Id.*

Dr. Byrd's request for evaluation by a specialist was denied in favor of an Alternative Treatment Plan ("ATP"). Dkt. 153-4 at 45-47. Thus, on October 8, 2018, Dr. Byrd advised Mr. Zamarron to use an antibacterial soap twice a day,[2] as well as attempt to lose weight. *Id.* Dr. Byrd also noted that he would open and drain the cyst to see if it could be resolved without surgical excision. *Id.* Dr. Byrd performed the incision and drainage ("I&D") on December 14, 2018. Dkt. 153-4 at 44.

Dr. Byrd saw Mr. Zamarron again on February 21, 2019, because Mr. Zamarron had begun experiencing drainage of the cyst on this tailbone again. Dkt. 153-4 at 40-43. Dr. Byrd told him

---

[2] Mr. Zamarron states that he never received the soap. Dkt. 199 at 24.

that he would again request evaluation by a surgeon for removal of the cyst, but these cysts have a high recurrence rate, and there was a high probability they would be right back to square one following the removal, as Mr. Zamarron had not only pilonidal cysts, but pilar cysts and pseudo folliculitis. *Id.* Dr. Byrd renewed Mr. Zamarron's prescription for Cleocin T solution and ordered a wound culture before submitting the request for general surgery. *Id.* Mr. Zamarron submitted a request for a surgical evaluation on March 12, 2019. Dkt. 153-4 at 37-39. On May 21, 2019, Dr. Tapia excised Mr. Zamarron's pilonidal cyst. Dkt. 153-4 at 75.

Mr. Zamarron was seen again in nursing for his cysts a few months later. Dkt. 153-4 at 36. Dr. Byrd was contacted and ordered that he be scheduled for cyst drainage. *Id.* Dr. Byrd saw Mr. Zamarron about week after that. Dkt. 153-4 at 31-34. Mr. Zamarron wanted preventative measures, but Dr. Byrd told Mr. Zamarron he was not aware of any. *Id*. They did some research together that corroborated Dr. Byrd's beliefs. *Id*. Dr. Byrd put in an order for Cleocin T solution. *Id.*

On September 6, 2019, Dr. Byrd preformed the scheduled drainage. Dkt. 153-4 at 30. But Mr. Zamarron was again seen in nursing on September 28, 2019, and October 9, 2019, for the draining cysts. Dkt. 153-4 at 27, 29. After the second visit, he was referred to Dr. Byrd, who saw him about a week later. *Id*. at 27, 26. Mr. Zamarron asked that the cysts be removed because of persistent drainage and pain. *Id*. Dr. Byrd advised him that he appeared to have a genetic predisposition to pilar cysts of the scalp, and that while surgical excision was an option, there was a possibility that he would simply just develop more cysts. *Id*. Dr. Byrd is not qualified to excise the cysts and, given the failure of all of the other treatment options, Dr. Byrd requested a referral for him to be seen by an offsite dermatologist. *Id.*

## 2. Dermatologist

Mr. Zamarron was seen by the dermatologist, Dr. Wolverton, on November 20, 2019. Dkt. 153-4 at 77-78. Dr. Wolverton diagnosed Mr. Zamarron with dissecting cellulitis of the scalp. *Id.* He recommended that Mr. Zamarron be prescribed Accutane, but the logistics of doing so in a prison setting were difficult, so in the meantime he recommended that Mr. Zamarron continue Doxycycline, add benzoyl peroxide, and try a vegan—or at least dairy free—diet, for three months. *Id.* at 11-13. Dr. Byrd noted that a vegan diet was denied, but that there is little dairy in the prison-provided diet. *Id.* Mr. Zamarron saw Dr. Wolverton again on March 3, 2020, Dkt. 153-4 at 10.

Dr. Byrd completed the training requirements to be able to prescribe Accutane on April 30, 2020. Dkt. 153-4 at 9. Mr. Zamarron began Accutane on May 5, 2020. *Id.* Mr. Zamarron had monthly virtual visits with Dr. Wolverton during the course of the Accutane treatment. Dkt. 153-1 ¶ 34.

Dr. Byrd had a follow-up visit with Mr. Zamarron on October 8, 2020. Dkt. 153-4 at 5-7. Mr. Zamarron reported that his condition was improving. *Id.* Dr. Byrd had another follow-up visit with Mr. Zamarron on January 21, 2021. Dkt. 153-4 at 1-4. His scalp and skin were doing well. *Id.*

### C. Mr. Zamarron's Grievances

Mr. Zamarron submitted several informal and formal grievances complaining about his care during the relevant time that Ms. Wright and Ms. Hobson responded to. *See* dkt. 199-42.

Mr. Zamarron submitted a grievance in April of 2018 describing his infected skin and cysts and asking to see a dermatologist. Dkt. 155-3 at 1. Ms. Hobson responded that he could see a dermatologist only if the doctor determined it to be appropriate. *Id.* She also stated that she would have the nurse see him regarding his request for bandages. *Id.* Mr. Zamarron appealed, and Warden

Brown's designee responded, explaining: "After review of the medical record it is indicated that you are being seen and treated per medical protocol based on your concerns…." *Id.*[3]

In another grievance, submitted in February of 2019, Mr. Zammaron asked to be referred to a dermatologist, but Ms. Wright responded that he had been given an alternative treatment plan and that his cyst had been drained. Dkt. 199-42 at 3.

Mr. Zamarron submitted an informal grievance on June 23, 2019, stating that he had been struggling with cysts since 2012, that a cyst was removed from his tailbone in May of 2019, that he was not given proper pain medication after that procedure, and that a non-defendant nurse stopped providing dressings after the cyst was removed, though another nurse did. *Id.* at 12-13. He also stated that he developed an infection at the removal site and that he had not received an alternative treatment plan. *Id.* at 13. He asked to be referred to a dermatologist. *Id.* Ms. Wright responded that he had received antibiotics and that his wound was healing. *Id.* at 14. Mr. Zamarron then submitted a formal grievance raising these same issues. Dkt. 155-3 at 18. Warden Brown's designee responded that his medical records were reviewed by a quality assurance manager, who referred the grievance to the Division of Clinical Health Services, consulted with Department medical personnel, reviewed his records, and found that his care was appropriate. *Id.* at 11, 29.

Mr. Zamarron submitted an informal request in August of 2019, describing his condition and asking to see Dr. Byrd. Dkt. 199-42 at 9. Ms. Wright responded, noting that he had seen the doctor. *Id.*

Mr. Zamarron submitted another request in September asking again to see a dermatologist. *Id.* at 15. Ms. Wright responded that his abscess has been drained and that Dr. Byrd had ordered

---

[3] Mr. Zamarron disputes that Warden Brown's designee responded to his grievance appeals, pointing to his signature on those documents. *See* dkt. 155-3 at 2, 15, 42. But, as Warden Brown explains, while those forms contain Warden Brown's signature, those signatures are initialed by the designee, indicating that the designee signed on Warden Brown's behalf.

9

Cleocin and Benzoyl peroxide gel. *Id.* Mr. Zamarron then submitted a formal grievance. Dkt. 155-3 at 42, 50. When that grievance reached the appeal stage, Warden Brown's designee responded that Mr. Zamarron was approved for a dermatologist visit. *Id.* at 44.

Mr. Zamarron filed a grievance in January of 2020. Dkt. 155-3 at 75. Ms. Wright responded that based on the recommendation by the outside doctor, he was to be on doxycycline and Benzoyl Peroxide. *Id.* at 65. The grievance was denied based on the conclusion that Mr. Zamarron's care was appropriate "per the medical professionals." *Id.* Warden Brown's designee concurred with that response. *Id.*

Mr. Zamarron submitted another informal request in in February of 2020, in which he complained that he had seen a nurse when he had requested to see Dr. Byrd. Dkt. 199-42 at 17. Ms. Wright responded that he had recently been seen by the doctor and that he would have a follow-up with the dermatologist. *Id.*

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For the purposes of this motion, the Court assumes that Mr. Zamarron's dissecting cellulitis is a serious medical need. To survive summary judgment then, he must show that the defendants acted with deliberate indifference—that is, that he or she consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Mr. Zamarron "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id*. (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42.

### A. Dr. Byrd

Dr. Byrd seeks summary judgment arguing that he provided "significant care" for Mr. Zamarron's scalp condition, prescribing oral and topical antibiotics, topical acne treatments, steroid injections, and incision of the lesions. But considering the facts in the light most favorable to Mr. Zamarron, a reasonable jury might conclude that while Dr. Byrd did try different treatments over several years, he regularly persisted in a course of action he knew was ineffective. See *Gonzalez v. Feinerman*, 663 F.3d 311, 314-15 (7th Cir. 2011) (holding that the plaintiff's "physicians were obligated not to persist in ineffective treatment" and that "[d]elay in treating a

11

condition that is painful even if not life-threatening may well constitute deliberate indifference ...."). For example, Dr. Byrd attempted intralesional steroid injections in March of 2017 and then again just a few months later even though they had not been effective the first time. Dkt. 199-9; dkt. 153-4 at 73. In addition, Mr. Zamarron was regularly prescribed Cleocin solution even though his condition persisted, and he protested that that medication did not help. Dkt. 153-4 at 74; dkt. 153-1 ¶ 6. Similarly, Mr. Zamarron was often prescribed antibiotics, seemingly to no effect. Dkt. 153-4 at 48-52, 58-60, 64-66. It was only in October of 2018, a year and a half after Dr. Byrd's first attempt at steroid injections, that he requested that Mr. Zamarron be sent offsite for surgical excision of his cysts. *Id.* at 45-47. That request was denied, and Mr. Zamarron was simply advised to use antibacterial soap and lose weight. *Id.* Then, nearly a year and a half after that, Mr. Zamarron finally did see a specialist who reached a different diagnosis and recommended a different course of treatment. Dkt. 153-4 at 77-78. While there was no evidence that Dr. Byrd could send Mr. Zamarron to an outside specialist without authorization, a reasonable jury might conclude that he delayed in requesting outside treatment and that this delay exacerbated Mr. Zamarron's condition. Accordingly, Dr. Byrd is not entitled to summary judgment on Mr. Zamarron's claims.

### B. Kim Hobson and Amy Wright

Next, Ms. Hobson and Ms. Wright seek summary judgment arguing that, as nurses, they lacked the authority to direct Mr. Zamarron's treatment. They argue that there is no evidence that they ignored any of his requests or failed to ensure that he received treatment. "As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022) (citing cases). But "nurses, like physicians, may

… be held liable for deliberate indifference where they knowingly disregard a risk to an inmate." *Id.* (quoting *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015)).

In support of his argument that these defendants were deliberately indifferent, Mr. Zamarron points to grievances he filed requesting treatment and referral to a dermatologist. In response to the 2016 grievance, which stated that he had submitted a healthcare request form and asked for treatment for his scalp, neck, and skin infection, Ms. Hobson stated that she did not see a request in her records and directed him to submit one. Dkt. 199-32. In response to his 2018 grievance requesting a referral to a dermatologist, Ms. Hobson stated that only the provider can make a referral. Dkt. 155-3 at 1.

As with Ms. Hobson, Mr. Zamarron points to several grievances he submitted to support his argument that Ms. Wright knew of and disregarded his condition. For example, in early 2019, in response to a grievance, she wrote that "the MD discussed your alternative treatment plan for your skin care, at that time she did schedule you to drain your cyst and this was completed. You were seen 12/28/18 and 1/19/19 by nursing sick call and will be scheduled to see the MD. You can discuss this with him at that time." Dkt. 199 at 22.[4] Mr. Zamarron also states that he wrote to her in February of 2019 chronicling his condition and again in August of 2019, he wrote an informal grievance to her, which including a diagram of his skin condition. Ms. Wright responded that the diagram could not go in the file and that the doctor discussed the condition with him. Dkt. 199-42 at 3. Similarly, in response to informal grievances in June, August, and September of 2019, and January and February of 2020, Ms. Wright responded that he had received medicine and that he had seen the doctor. *See id*. at 12-14, 9, 17.

---

[4] Mr. Zamarron cites to Exhibit AQ, but a copy of this document was not filed with the Court.

It is undisputed that Ms. Hobson and Ms. Wright reviewed and investigated Mr. Zamarron's complaints and determined that he was receiving care for his condition. Neither Ms. Hobson or Ms. Wright had the authority to direct his treatment. Mr. Zamarron points out that they could alert other medical staff if they were concerned that he was not receiving necessary care, but he has not shown they were made aware that his treatment was deficient. While Mr. Zamarron was unhappy with their conclusions, and a jury may ultimately find that Dr. Byrd was in fact deliberately indifferent to his condition, Mr. Zamarron has pointed to no evidence from with a jury could conclude that either Ms. Hobson or Ms. Wright was aware that Dr. Byrd was not providing sufficient treatment to Mr. Zamarron. Ms. Hobson and Ms. Wright are therefore entitled to summary judgment.

### C. Wexford of Indiana, LLC

Wexford of Indiana, LLC argues that is entitled to summary judgment because Mr. Zamarron has no evidence of any policies, practices, or procedures of Wexford that led to a violation of his constitutional rights. Private corporations like Wexford, which act under color of state law, are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). To support a claim against Wexford, then, Mr. Zamarron must "trace the deprivation to some municipal action…, such that the challenged conduct is 'properly attributable to the municipality itself.'" *Dean*, 18 F.4th at 235. "A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019). Next, he must show that the municipal action amounts to deliberate indifference. *Dean*, 18 F.4th at 235. "If a municipality's action is not facially unconstitutional, the plaintiff 'must prove that it was

obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences.'" *Id.* "[C]*onsiderably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation. *Id.* (cleaned up) (emphasis in *Dean*). Finally, the plaintiff must show a direct causal link between the municipality's action and the deprivation of federal rights. *Id.*

Mr. Zamarron argues that Wexford had a policy of limiting expenses at the expense of patient care. In support, he points to several provisions in Wexford's Technical Proposal to the IDOC. *See generally* dkt. 199-50. For example, that Proposal states in several paragraphs that Wexford will provide cost savings. *See, e.g.*, *id.* at 2, 5, 8, 11. In the Proposal, Wexford explains that it will save money through its telehealth program, *see id.* at 4, 13, and through pharmacy cost management strategies including pill splitting and "the use of cost-effective medications." *Id.* at 21, 183. Specifically, Wexford states that its "goal is to help the IDOC to avoid offender transport and offsite security costs," it "will make every effort to minimize offsite clinic trips." *Id.* at 14. Mr. Zamarron also points to evidence that, when Dr. Byrd sought additional treatment for Mr. Zamarron, other Wexford employees made decisions prioritizing cost savings over proper care for Mr. Zamarron's condition. *See* dkt. 153-4 at 45-47.

Based on this evidence, a reasonable jury could conclude that Wexford maintains a policy—formal or informal—of prioritizing cost savings over adequate patient care. A reasonable jury could also conclude that this policy creates an obvious risk that, like in this case, medical staff would persist in providing inadequate care rather than seeking a consultation. A reasonable jury could further conclude that Wexford was aware of this risk and consciously disregarded it.

**D. Wexford Health Sources, Inc.**

Mr. Zamarron also sues Wexford Health Sources, Inc. This entity seeks summary judgment arguing that it was not involved in his care and treatment. As with his claim against Wexford of Indiana, LLC, to hold Wexford Health Sources, Inc. liable under § 1983, Mr. Zammaron must show that his injuries resulted from "written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019). Mr. Zamarron contends Wexford Health Sources, Inc. was involved in his care because this entity works together with Wexford of Indiana, LLC to provide medical care to prisoners. While Wexford Health Sources, Inc. provides administrative functions and specific personnel to oversee Wexford of Indiana, LLC, *see* dkt. 199-46, Mr. Zamarron has provided no evidence that Wexford Health Sources, Inc. was involved in his medical care, whether through its policies, practices, or customs, or otherwise. Indeed, the medical personnel involved in his treatment were employees of Wexford of Indiana, LLC and the contract governing the medical care was between the IDOC and Wexford of Indiana, LLC. Dkt. 153-1 ¶ 2; 153-2 ¶ 2; 153-3 ¶ 2. Because Mr. Zamarron has failed to show that Wexford Health Sources, Inc. was involved in his medical care or responsible for his injuries, this entity is entitled to summary judgment.

**E. Richard Brown**

Warden Brown seeks summary judgment arguing that he was not personally involved in any alleged deprivation of Mr. Zamarron's rights. "Individual liability under § 1983 ... requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).

It is undisputed that Warden Brown was not aware of Mr. Zamarron's complaints regarding his medical care. Mr. Zamarron argues that Warden Brown himself responded to his grievance appeals. But while those documents include Warden Brown's handwritten name, any reasonable

jury would conclude that they were signed by a designee, as indicated by the slash mark and initials after Warden Brown's name. *See* dkt. 155-3 at 2, 15, 42. Mr. Zamarron also points out that the Grievance Process requires the Warden to meet with the designee monthly to discuss issues relevant to the grievance process. *See* dkt. 176-2 at 9. But Mr. Zamarron points to no evidence that show that this policy requires the Warden and his designee to discuss every grievance appeal or that Warden Brown discussed Mr. Zamarron's grievance appeals with his designee. Because Warden Brown was not aware of, or involved in, the treatment at issue in this case, he is entitled to summary judgment.

## IV.
## Conclusion

Defendant Richard Brown's motion for summary judgment, dkt. [155], is **GRANTED**. The Medical Defendants' motion for summary judgment, dkt. [151], is **GRANTED IN PART AND DENIED IN PART**. Mr. Zamarron's claims against Richard Brown, Kim Hobson, Amy Wright, and Wexford Health Sources, Inc. are dismissed and the clerk shall terminate these defendants on the docket.

Mr. Zamarron's motions to file a surreply brief, dkt. [181], dkt. [217], are **GRANTED** to the extent that the arguments in the proposed surreply briefs have been considered.

The claims against Samuel Byrd and Wexford of Indiana, LLC remain and shall proceed to settlement or trial if one is necessary. The Court previously recruited counsel to represent Mr. Zamarron for settlement purposes. Dkt. 150, 158. The Court will now seek to recruit counsel to represent Mr. Zamarron for the remainder of the proceedings.

**IT IS SO ORDERED.**

Date: 3/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

All Electronically Registered Counsel

Distribution:

KENNETH LEE ZAMARRON
194018
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel